### BRANDT v. LOUIS K. LIGGETT CO.

(District Court, D. Massachusetts. March 21, 1914.)

#### No. 394.

PATENTS (§ 328*)—INFRINGEMENT—FOUNTAIN PENS.

Eberstein and Brandt patent No. 764,227, for an improvement in fountain-pens, claims 1, 2, providing for a holder with screw threads and an outwardly flared pen end, etc., intended to prevent leaking and sweating, *held* not infringed by a pen constructed under Sanford patent No. 969,-198, having a beveled or tapered cap end, the taper of which was so abrupt as to be in marked contrast with that shown in the drawings of complainant's patent.

In Equity. Suit by Charles Brandt against the Louis K. Liggett Company for patent infringement. Bill dismissed.

Oliver Mitchell, of Boston, Mass., for plaintiff.

Emery, Booth, Janney & Varney, of Boston, Mass., and D. Walter Brown, of New York City, for defendant.

DODGE, Circuit Judge. The plaintiff is now sole owner of United States patent No. 764,227, issued July 5, 1904, to Eberstein and Brandt. The patent is for an improvement in fountain-pens. He charges the defendant company with having infringed it by the sale of two fountain pens, Exhibits A and B.

The alleged infringing pens were made by the Sanford & Bennett Company of New York, which is defending this suit. Their sale by the defendant is not disputed. They are marked as made under

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

United States patent No. 969,198, issued September 6, 1910, to William W. Sanford.

The advantage sought by the patent is declared therein to be to prevent the pen from leaking when turned bottom side up, and also to prevent its "sweating." Both the pen of the patent and the defendant's pen have what are referred to in the patent as "the usual holder, pen-point and a main cap having a closed end." The patent provides what it calls a "supplemental cap," adapted to be placed within the main cap, not attached to it, but fitting within it closely enough to be held there by friction. The supplemental cap is to have a pen-receiving pocket, and is to be so shaped at its end as to fit within the tapering pen end of the barrel or penholder, which pen end is to be flared outwardly and receive within it the end of the supplemental cap. When the main cap is screwed upon the holder, the supplemental cap so held within it is to enter the interior of the flared end of the holder, make a tight joint therewith, when the main cap is screwed down, and thereby prevent any ink escaping from the pen from getting into the main cap by confining it wholly within the supplemental cap.

Two of the three claims of the patent are said to be infringed. They are:

"1. In a fountain-pen, a holder provided with screw-threads and having an outwardly-flared pen end, a main cap to cover said end, said cap having screw-threads to co-operate with the screw-threads on the holder, and a supplemental cap separate and independent from the main cap and located entirely within the same within the main cap, said supplemental cap having a pocket or chamber to receive the pen-point and being tapered at its end whereby when the main cap is applied to the holder said tapered end enters and centers itself against the interior of the flared portion of the holder.

"2. In a fountain-pen having the usual holder, pen-point and a main cap having a closed end, said holder being provided with a flaring end, a removable supplemental cap independent from the main cap and located entirely within the same, said supplemental cap having a chamber to receive the pen-point, and having a non-yielding inwardly-tapered end to enter and engage the flaring end of the holder and make a tight joint therewith."

In the manner of engagement between the end of the supplemental cap and the pen end of the holder when the main cap is screwed home, may be said to lie the only differences between the pen of the patent and the defendant's pen which need be considered for the purposes of this case.

The pen end of the defendant's holder is "outwardly flared," or is "provided with a flaring end" only in the sense that its edge is not quite flat in section, but very slightly inclined toward the axis of the holder. If the defendant's supplemental cap is "tapered at its end" or has "a non-yielding inwardly-tapered end," the bevel or taper begins so close to the end and is so abrupt as to be in marked contrast with the taper shown in the drawings of the patent. The contact between the two ends, when complete, is within the outer circumference, but outside the inner circumference of the edge of the pen end of the holder. That the tapered end of the defendant's cap "enters and centers itself against the interior of the flared portion of the

holder," or "enters and engages the flaring end of the holder so as to make a tight joint therewith," does not seem to me true in the same sense in which those statements are true of the patentee's device as shown by his drawings. Instead of the tapered end "entering" the end of the holder or centering itself against the "interior" thereof, the contact in the defendant's pen seems to me practically an end to end contact, and the resulting joint, therefore, a joint differing substantially in character from that produced by the patentee. All this is much more easily apparent by inspection of the defendant's pens themselves than by description. Fig. 2 of the Sanford patent, under which the defendant's pens are said to be made, illustrates some of the differences referred to above by comparison with the drawings of the patent, but the pen end there represented in section seems to me rather better qualified to be called "flaring" or "flared" and to fit the surface of the "taper" on the cap better than do the corresponding parts of the alleged infringing pens produced.

Further indications are found in the language of the patentee's specification that the joint formed by contact between the ends of the supplemental cap and the holder is to be of a kind unlike that which is formed in the defendant's pen. The specification states that the supplemental cap is to "enter and fit within" the flared portion of the holder, also that the screwing home of the main cap is to bring the "tapered portion" of the supplemental cap "hard against the interior of the flanged portion of the holder," also that there is special advantage in having the line of contact between the supplemental cap and holder "on the interior of the holder rather than on its end or exterior, because where the line of contact is just on the interior the ink cannot by any possibility get over the edge 16 of the holder end." The line of contact in the defendant's pen cannot, as it seems to me, be fairly called within what corresponds to the edge 16 of the holder end, nor do I think the other statements quoted can be applied, in any proper sense, to the defendant's pen. The complainant says that the difference of the defendant's pen over the plaintiff's patent as regards the slant of the flaring end is the difference between a saucer and a bowl, and is one only of degree. It seems to me that the difference is sufficient to prevent that kind of contact between the tapered portion of the cap and the interior, whether of "saucer" or "bowl," which the patent describes.

No broad construction can be resorted to for the purpose of assisting the plaintiff upon this point. Supplemental caps within the main cap, to fit against the end or edge of the holder and confine any ink escaping from it, are of too frequent occurrence in the pens of the prior art, and the contact joints which they form with the ends of the holder are too nearly similar in character to that of the patent. In view of other features of the patent, I am unable to hold that no patentable novelty is disclosed by it, but I consider it limited to the particular construction described.

It may be added that the only pen proved to have been made by the patentees, or under license from them (Defendant's Exhibit C), more nearly resembles the alleged infringing pen than the pen of the

patent in the form given the ends of the supplemental cap and of the holder, and in the kind of joint resulting from contact between them.

I am obliged to hold that infringement by the defendant of the claims in question is not shown, and there may be a decree accordingly.